# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. RASHAD J. CHANDLER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-11389     John P. Colton, Jr., Judge**

---

**No. W2001-01565-CCA-R3-CD - Filed May 15, 2003**

---

A Shelby County grand jury indicted the defendant on charges of first degree premeditated murder, felony murder, and especially aggravated robbery. A trial jury subsequently convicted him of first degree premeditated murder and acquitted him of the remaining charges. The defendant then unsuccessfully pursued a new trial motion. In this appeal the defendant asserts that the trial court erred by not suppressing his statement and that the jury's verdict is inconsistent with the evidence presented at trial. After reviewing the record and relevant authorities, we find neither of the defendant's claims meritorious. We, therefore, affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Dewun R. Settle, Memphis, Tennessee, for appellant, Rashad J. Chandler.

Paul G. Summers, Attorney General & Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; and P. T. Hoover, Assistant District Attorney General, for appellee, State of Tennessee.

## OPINION

### Factual Background

While more detail will be provided within the analysis of the individual issues, the facts of this case revolve around the shooting death of Roy Lee Monger in early May of 1997. No dispute exists that shortly after hearing gunshots, family members discovered the victim in his grandmother's front yard. Witnesses who had responded quickly to the victim also testified that upon discovering the victim's body in the front yard, they noticed that the victim's pockets had been pulled inside out. According to the medical examiner the victim received two gunshot wounds, one of which led to his death.

Though no one indicated that they could identify the defendant as Mr. Monger's assailant, a cousin of the victim related seeing two individuals wearing "skull caps" or "skull masks" which covered their faces start shooting at the victim and another person. On cross-examination this witness affirmed that one of the masked people had actually approached and shot the victim. Another of the victim's cousins later testified that he had seen a person with the defendant's shape around the side of the house after the shooting.

Furthermore, both the prosecution and the defense presented evidence reflecting on the relationship existing between the defendant and victim prior to the shooting. One witness stated that the defendant had told her that he was going to rob the victim because the victim earlier had pulled a gun on him. She added that about a week before the shooting, she had actually ridden with the defendant to the victim's home; that the defendant was armed at the time; that the defendant had left the vehicle and approached the victim; but that on that occasion she had no knowledge of whether the defendant had carried through with robbing the victim. Another witness who had known the defendant acknowledged telling the police about specific incriminating statements that the defendant allegedly had made to him. Finally, we note that the defendant himself gave to the authorities a thoroughly incriminating statement, wherein he admitted killing the victim.

After hearing this and additional proof, the jury convicted the defendant as aforementioned of first degree premeditated murder. Through the instant appeal the defendant raises two issues seeking relief from this conviction.

## Suppression of Statement

The defendant first avers that the trial court erred in not suppressing his statement. More specifically, the defendant avers that he was under arrest at the time that he gave the statement but was not properly advised of his Fifth Amendment rights before incriminating himself.

The Fifth Amendment to the United States Constitution provides in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states, "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). In Miranda, the United States Supreme Court held that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. The Supreme Court added that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. Id. Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by Miranda. Id. at 444. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

-2-

In analyzing this type of issue, an appellate court is to conduct a de novo review regarding the trial judge's application of law to the evidence presented. State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626, 628-29 (Tenn. 1997). However, the "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The trial court is also entrusted with the resolution of credibility matters, evidentiary conflicts, and questions concerning the value and weight to be afforded evidence. Id.

From our review of the record, it appears that the defendant apparently gave a series of statements. The first was taken in the evening on May 11, 1997. According to the defendant's testimony, a police officer paged him that afternoon, and the two agreed to meet at the home of the defendant's "auntie." From that residence, the officers provided the defendant a ride to the police station in order for him to give a "witness statement." Over a period of hours, the officers took this statement and then allowed the defendant to leave. Though the defendant claimed that he did not actually leave, Lieutenant Swauncy recalled that the defendant did in fact leave the police station. In any case, the defendant conceded that he was not under arrest at that point.

Swauncy testified that the defendant returned for a second questioning at around 1:00 a.m. on May 12. The officer also recounted that he "gave [the defendant] a form with his rights for him to read his rights and after reading his rights, he agreed to his rights and signed the documents, this form." Thereafter, the State offered the rights waiver form into evidence. The exhibit indicates that the form was filled out between 1:02 a.m. and 1:05 a.m. Lieutenant Swauncy stated that the defendant appeared in control of his faculties at the time of the waiver. Though the hour was late, the defendant did not appear different than he had earlier the previous day when Swauncy had seen him.

Swauncy added that after the defendant had signed the form and communicated his willingness to speak with the officers, they interviewed the defendant, getting an oral statement, and then took from him a typed statement. This formal written statement reflects that it was begun at 2:40 a.m and that one of the officers advised the defendant of the following before questioning:

RASHAD JAMAL CHANDLER, you are under arrest and will be charged with MURDER in connection with this complaint.

I am going to ask you some questions regarding the above complaint. You have the right to remain silent and anything you say can be used against you in a court of law. You have a right to have a lawyer, either of your own choice, or court appointed if you are unable to afford one, and to talk with him before answering any questions, and to have him with you during questioning if you wish.

If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Q: Do you understand each of these rights I have explained to you?
A: Yes. [defendant's initials]

Q: Do you wish to make a statement now?
A: Yes. [defendant's initials]

Toward the end of the statement, the following exchange took place:

Q[:] Was this statement given freely and voluntarily without any threats, promises, or coercion being used against you?
A[:] Yes.

Q[:] We will ask you to read your six page statement and if you are in agreement with it[, w]ill you initial the bottom right corner of the first five pages and place your signature on the last page on the line provided, along with the date and time you signed it[?] Will you agree to this?
A[:] Yes.

The last line of the statement bears the defendant's signature and reflects that he signed this document at 4:30 a.m. on May 12, 1997.

When called, the defendant admitted that he had signed both of these documents; however, he claimed to have read neither before signing. Regarding the rights waiver form, the defendant stated that the officers had "just told me to sign this." With respect to the statement, the defendant acknowledged that he had been given time to read the statement but alleged that he did not do so. The defendant also stated that he had been unaware of his right to have an attorney present and affirmed that he had felt threatened and under duress while giving the second statement. Nevertheless, he acknowledged that no one had physically threatened him. He also stated that during this time he had requested and been allowed to go to the restroom. Furthermore, the defendant testified that the officers had asked if he was hungry or thirsty and, learning that he was thirsty, had provided him with a Coke.

At the conclusion of the proof on this motion, the trial court denied the defendant the relief sought and stated:

. . . a greater weight and preponderance of the evidence that the statement was given voluntarily, freely, and without undue coercion, force, or stress, or duress, and that the defendant was properly given his constitutional rights in this particular – at this particular time, and that these rights were properly explained to him.

The thrust of the defendant's argument referencing the authorities' alleged failure to "formally" advise him of his rights suggests that, for a statement to be admissible, the authorities must orally provide a defendant his or her Miranda rights and orally inquire as to whether these rights are understood. However, he cites no specific case law to support this proposition. From our research we conclude that the relevant test set out in Miranda is not whether an individual was verbally advised of his or her rights prior to waiving them, but rather whether the accused was

"adequately and effectively apprised of his [or her] rights and [whether] the exercise of those rights [was] fully honored." Miranda, 384 U.S. at 467.

Within a few years of the Supreme Court's handing down its decision in Miranda, this Court applied the principles of Miranda to a factual situation similar to that presented in the instant case. In Carter v. State, 447 S.W.2d 115 (Tenn. Crim. App. 1969), an "officer admitted that he did not read the statement of rights to the defendant [Carter], but let [Carter] read the statement himself." Id. at 117. Thereafter, Carter made an incriminating statement. Id. The document in that case reflected that twenty-two minutes had passed from the time that the "caption" was completed until the "endorsement" of the form. Id. Three days previously in an investigation of a different crime, Carter had been presented with and signed, after the passage of ten minutes, a rights waiver form. Id. at 116-17. It appears that the form was not read to him on that occasion either. Id. at 116-17.

Holding the statement admissible, this Court stated that:

> [T]he U. S. Supreme Court said in Miranda that: "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms * * *." The Court uses "apprised" and "informed" and "warn" and "warnings given" in referring to the process of advising defendants of their rights. Nowhere have we noticed a requirement that the advice be exclusively oral.
> Miranda expressly places the burden upon the State to prove the warnings and waiver of rights, saying also "an express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver". Here, we have the statement of rights in writing, followed by an express waiver in writing. A written waiver executed by one who is literate is certainly more persuasive that he did know and waive his rights than testimony of witnesses as to an oral one, and we feel is more effective in protecting the rights of the subject under interrogation. And what could offer more assurance that all one's rights had been fully explained to him than to have the explanation given in writing on the same paper on which he signed an express waiver? One who can read is much more likely to understand what he has himself read than he can what is merely read to him.

Id.

That said, this court did observe in dicta that the better practice would have involved the officer's also orally reading the accused his rights. See id. at 117. One of the officers in the instant case apparently did orally apprise the defendant of his rights before taking the formal statement but not prior to the interview which immediately preceded the formal statement.

Nevertheless, Lieutenant Swauncy testified that he had not only presented the defendant the waiver form but that the defendant had read the form before signing. Furthermore, information at the top of the statement provides that the defendant has a twelfth grade education, and the defendant does not claim to be illiterate.

From the record presented, we find that the evidence clearly substantiates the trial court's decision to admit the defendant's statement. We also conclude that the defendant was properly advised of and waived his Fifth Amendment rights, and that his statement was admissible.

**Sufficiency**

The defendant next asserts that the evidence is insufficient to support his conviction. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. While the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded," case law provides that "a criminal offense may be established exclusively by circumstantial evidence." State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); see also, e.g., State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987).

Turning to the language of the first degree murder statute, Tennessee Code Annotated section 39-13-202, in pertinent part, provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann § 39-13-202(a)(1). Subsection (d) of this statute further states:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). Additionally, for the purposes of our code, the word "'[i]ntentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18).

-6-

The existence of premeditation may be established by proof of the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Factors which tend to establish the existence of premeditation "include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). In addition, State v. Bordis, 905 S.W.2d 214 (Tenn. Crim. App. 1995), provides that a jury faced with resolving this question also may utilize facts raising the inference of a motive and/or the implementation of a preconceived design. See id. at 222.

With these provisions in mind, we turn to the record before us. As above-mentioned, the victim was shot and killed in front of his grandmother's home. According to Tara Sanlin the defendant had told her that he was going to rob the victim because the victim had pulled a weapon on him. In addition, Jaquannee Carter, the defendant's sole witness and the mother of his child, verified that there had been some level of conflict between the victim and the defendant in the weeks leading up to the shooting, though her testimony suggested that the victim had been the aggressor. In the defendant's statement he acknowledged shooting and killing the victim because the victim had been threatening to kill him. The defendant further recounted that he had been wearing a "skull cap with the eyes cut out" at the time. In describing what had led up to the shooting, the defendant told the authorities that:

> Two or three months ago me [sic] and [the victim] had gotten into it over a 45 automatic that his brother, L. T. Monger, had sold to me for hundred [sic] and sixty dollars . . . . L. T. took the pistol back from me while we was [sic] in my car in front of his mother-in-law [sic] house. He cocked it on me like he was going to shoot me, and I let him walk off with the pistol. Then he gave the pistol to his brother, [the victim].

> [The victim] kept threatening me, telling me he was going to get some "G's" to kill me. Two nights before the shooting he put the word out he was going to put a hit on me. Somebody that I know that wasn't suppose [sic] to tell me told me. Around the end of March and the beginning of April I walked up in [the victim's] grandmother's yard just to talk to him, just to asked [sic] him something and he pulled a 45 automatic on me. I guess he felt he had to get me before I got him, but his brother L. T. asked me to leave it alone. I just pass [sic] by [the victim], wouldn't [sic] say nothing [sic] to him, but he constantly threatened my life.

> The night he died somebody came and told me [the victim] told them he was going to get me. I didn't know when that was that was the problem[.] I flipped out. I got with Mario about ten thirty when I dropped his sister Tara off. Mario told me a lot more s*** about what [the victim] was gonna [sic] do to me. I just couldn't take it anymore. We rode and talked in my car. I had just got to the point where I just said f*** it. I asked Mario for his .380[. T]hat's all I know. We was [sic] still riding around[.] I was hesitating, thinking to myself. I parked my car on King Road

westbound. Mario was still in the car. When I hit the side of the building (reached) my mind was going in different directions. I got in [the victim's] back yard. I stayed there for a while thinking. I stalled for a while. Then I heard some shots coming from the front of the house. I saw James Junior running through the field and another n***** running behind him, shooting at him. So I walked on the side of the house, up to the front[. W]hen I got to the corner of the house (northeast corner) [the victim] bumped into me. He fired at me[. H]e had a 45 automatic. My reflexes [–] I pushed his hand down and I pushed him back and I started to shooting. I didn't know how many shots I fired. After that I blanked out and ran back to my car and pulled off. Mario was still sitting in the car.

Walter Phillips, one of the victim's cousins, testified that the victim's shooter had worn a skull cap / skull mask covering the shooter's face. The witness affirmed that another person in the yard had also been shot. Phillips added his belief that the shooter had fired "about three times." Antoine Carson, another of the victim's cousins, also testified stating that he had seen an unidentified person of the defendant's size and shape around the side of the house after the shooting.

Viewing the whole of this testimony in the light most favorable to the State, the prosecution clearly met its burden of proving beyond a reasonable doubt all of the elements of first degree premeditated murder.

As a corollary to his sufficiency argument the defendant contends that the evidence which supports his murder conviction would also establish his guilt of the especially aggravated robbery charge of which he was acquitted. Therefore, the defendant reasons the jury must have found the prosecution witnesses incredible. However, it is the jury's prerogative to sort through the evidence presented and accept or reject it in whole or in part. Moreover, consistent verdicts are not required so long as "the evidence establishes guilt of the offense upon which the conviction was returned." Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973); State v. Hays, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999). This issue is without merit.

## Conclusion

For the foregoing reasons we find that the defendant's claims do not entitle him to a new trial or dismissal of his conviction. Accordingly, we AFFIRM the lower court's actions and the defendant's conviction.

_____
JERRY L. SMITH, JUDGE